SOUTHERN DISTRICT OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
SABRINA RAMBARRAN
                        Plaintiff,

                                                                                     COMPLAINT

       -against-

THE MOUNT SINAI HOSPITAL,
JEFF COHEN, CARYN PAILLEX TIGER,
GIL DIAZ, DOROTHY KIMINSKI,

                        Defendants,

Demand for Jury Trial
------------------------------------------------------------X

## I. PRELIMINARY STATEMENT

Plaintiff brings this action to redress the defendants' discriminatory practices and actions that were taken against plaintiff and caused the termination of her fourteen-year employment with Mount Sinai Hospital. Defendants all of whom hold positions of authority, or as managers and supervisors, did conspire and agree with each other to deprive and suborn defamatory statements about plaintiff, including that plaintiff was a thief, and had stolen food-stuff from the employee cafeteria.

Defendants, being motivated by an animus for plaintiff's race and national origin, acted with malice and a reckless disregard for the truth, asserted and published these statements as fact; they had published such statements to plaintiff's co-workers and others, known and unknown, including individuals who had no legitimate reason to know plaintiffs termination or the reason she was terminated.

That defendants, and each of them, acted in violation of title 42, United States Code § 1981, and § 1985(3), and the common law of the state of New York.

As a direct and proximate result of defendants' violation of federal and state law, plaintiff has suffered a loss of past and future income and benefits, damage to her reputation and character, and great emotional and mental suffering.

Plaintiff seeks compensatory damages in the amount of $1,000,000.00 and punitive damages in the amount of $5,000,000.00.

## II.  JURISDICTION AND VENUE

1. The District Court has jurisdiction over this matter under title 28, United States Code, § 1343(3); and § 1341; plaintiff also seeks permission to invoke the District Court supplemental jurisdiction over pending parties and claims under Title 28, United States Code § 1367.  Venue is proper in the Southern District of New York because some or all of the events occurred within this district.

## III.  PARTIES

2. At all relevant times herein, plaintiff, Sabrina Rambarran, of Guyanese decent, immigrated to the United States in 1988; she is of dark skin, and racially categorized as black.  She worked at Mount Sinai Hospital for fourteen years before being terminated as a result of defendants' discriminatory actions taken against her.  Plaintiff became a naturalized citizen of the United States in 1995 and presently resides in the county of Queens, in the state of New York.

3. Defendant, Mount Sinai Hospital, is a non-profit hospital organization organized and existing under the laws of the state of New York; it is a large teaching hospital, located in the city of New York and the extent of its operations as a hospital effect upon interstate commerce.  Mount Sinai employed plaintiff for fourteen-years, continuously, before terminating her on or about July 20, 2005.  Mount Sinai provided

plaintiff, and all others similarly situated, with medical benefits, a retirement plan comprised in part of employer contributions, and paid annual and sick leave.

4.     At all relevant times herein, defendant Gilbert Diaz, is an employee of Mount Sinai Hospital, where he works as a security agent; and, in that capacity, defendant Diaz became personally involved in each of the activities in which plaintiff claims herein.  Notwithstanding, defendant Diaz was acting within the course, scope and in furtherance of his employment with Mount Sinai Hospital.  On information and belief, defendant Diaz resides in the state of New York.

5.     At all relevant times herein, defendant Jeffery Cohen, is employed by Mount Sinai Hospital as a vice president in labor relations in the human resources department; and as such defendant Cohen was informed of and approved of each adverse employment action taken by defendants against plaintiff.  Notwithstanding, defendant Cohen was acting within the course, scope and in furtherance of his employment with Mount Sinai Hospital.  On information and belief, defendant Cohen is a citizen of the United States and resides in the state of New York.

6.     At all relevant times herein, defendant Caryn Tiger, is employed by Mount Sinai Hospital as a vice president in labor relations in the human resources department; and as such, she had notice of, was informed of and approved of all adverse employment actions taken herein; and as such was acting within the course, scope, and in furtherance of her employment with Mount Sinai Hospital.  Further, defendant Tiger also has had prior notice of and approved of the termination long before plaintiff was terminated on or about July 20, 2005.  On information and belief, defendant Tiger is a citizen of the United States and resides in the state of New York.

7.      At all relevant times herein, defendant Dorothy Kiminski is a supervisor of nursing personnel in the Annenberg Annex surgical suite.  Defendant Kiminski was plaintiffs direct supervisor and superior, and as such, would have had prior notice and provided input for all adverse employment actions taken against plaintiff.  Further, defendant Kiminski was known by general reputation, for being biased and for holding in low esteem, those individuals, who are members of recognized minority groups of both race and national origin.  Further, prior to any of the events complained of herein, defendant Kiminski had complained of plaintiff for her "unintelligible" use of the English language, for her speaking with an accent that was difficult to understand.  Notwithstanding, defendant Kiminski was acting within the course, scope, and in furtherance of her employment at Mount Sinai.  On information and belief, defendant Kiminski is a United States citizen and resides in the state of New York.

## IV.  FACTS

8.      At all times relevant herein, plaintiff Sabrina Rambarran, held the position of that of a certified operating room technician, assigned to the surgical suite at the Annenberg Annex, in the Annenberg Annex under the supervision of Dorothy Kiminski, the supervisor of nursing personnel in surgical services.  Plaintiffs position, required her to "scrub" surgical procedures and to assist the surgeon and the surgical nurse, all necessary means required for a successful surgical outcome for the patient.

9.      The most basic of plaintiff's responsibility was that of remaining in the surgical suite at all times while the scheduled proceeding was taking place.

10.     Plaintiff was also required to dress, like the rest of the surgical team, in what are known as surgical scrubs, as her uniform.  "Scrubs," which consist of a loose

fitting, short sleeve cotton top and pants held at the waist by a drawstring.  Plaintiff wore scrubs issued by Mount Sinai Hospital.

11.     Because the sets of scrubs worn by plaintiff and others similarly situated were the property of Mount Sinai Hospital, plaintiff was required to change into her set of scrubs in the morning and back to her "street clothes" in the evening upon leaving work.  For this reason, all Mount Sinai Hospital employees and attending physicians, those of whom worked in the operating rooms, were provided with a locker in one of the nearby locker rooms.

12.     In order to maintain sterile conditions, plaintiff and all others similarly situated, were required to store their purses, billfolds, bags, containers and articles of clothing.  This restriction limited plaintiff from carrying money on her person during her workday because it would require plaintiff to place individual paper bills in the breast pocket of the surgical scrub.  The breast pocket is the only pocket found in a pair of scrubs.  Handling money in this manner rendered the risk that at some point the money might fall outside of the pocket and into a sterile field.  The money may even fall into open incisions in patients.  Practically speaking, the limitation imposed by the surgical uniform required plaintiff to return to the locker room at all times before she was to purchase an item including food or beverage.

13.     At all relevant times herein, plaintiff and other nursing personnel assigned to the Annenberg Annex operating room complex, would utilize a cafeteria identified as GP-3.  This cafeteria is limited to employees only and is open for very limited hours; it is maintained primarily for the convenience of employees located in an area some distance away from the main cafeteria.

14.     The cafeteria itself is informal and small.  All food and beverage must be obtained through the food service worker, who is present during all hours of operation.  Only one person works in the cafeteria.  The sole caretaker of the cafeteria performs all functions necessary for cafeteria operations, including dishwasher and cashier.  At all relevant times herein, the caretaker in cafeteria GP-3 was known as Velda.

15.     Velda, in order to accommodate surgical personnel, who routinely have shortened breaks and meal periods imposed upon them by surgery and surgeons, would extend the courtesy of allowing plaintiff and other nursing personnel to pay for their food later.  This extension of courtesy would avoid the inconvenience of having plaintiff and others from going to their lockers to obtain cash before having the nourishment at the cafeteria; this practice would save employees the time required of having to walk first to a locker room inconveniently located away from the cafeteria and the surgical suites.  Velda's extended this informal arrangement to nursing personnel, which allowed them to pay for their food later in the day, or the next time they came to the cafeteria.  The arrangement was reasonable to all, especially to the small group of nurses and techs who utilized the cafeteria together.  Additionally, the amount charged to an employee for a meal was small.

16.     However, defendants herein, the nursing supervisor, the security agent, and the labor relations officers, either disapproved of the practice, or decided to use it as a pretext for discriminatorily motivated adverse employment actions.

17.     In or about March 2005, after a private investigation of the main cafeteria uncovered a significant theft of money by cafeteria personnel, particularly the cashiers, defendant Diaz installed a surveillance camera in the area around GP-3 in order to record individuals who pass through the cafeteria line.  They installed the surveillance device

and hid the device in a smoke detector. Diaz installed the smoke detector in the ceiling and positioned it approximately fifteen to twenty feet away from the entrance of the cafeteria; and, the ceiling is approximately thirteen feet above the floor.

18.    The images captured by Diaz's device are of poor quality. In fact, the images produced by Diaz's device were of such poor quality that the foodstuff, beverages, and even the individual who appeared in the image could not be identified. In fact, the image captured is deficient as proof that anyone pilfering food from the cafeteria. Notwithstanding, defendants are determined to use the surveillance tape, most likely because it contained events and occurrences which would not be expected to be repeated. Nonetheless, Diaz has continued to use the device. On May 15, 2005, the device captured a series of images that purportedly support defendants' contention that plaintiff "stole foodstuff" from the cafeteria. It is likely that the defendants' chosen segment may reveal a person of color in the cafeteria line.

19.    To conclude the segment represented plaintiff's act of stealing food from the cafeteria, it is requisite that the tape be "interpreted" by Diaz and other defendants, including the nursing supervisor because she was familiar with all nursing personnel.

20.    In this instance, where the plaintiff faces an accusation of stealing, with a tape of such poor quality as evidence, perceived race is the only identifying factor available to the defendants. At that time, plaintiff, being of Guyanese descent, was one of only two women of color under the employ of Dorothy Kiminski.

21.    Kiminski has the general reputation for being racially biased and prejudiced. In fact, Kiminski has been known to refer to minorities by derogatory nicknames; and it is of little surprise, that the images captured by Diaz's device, which

could be perceived as simply a poor-quality image of anyone or thing, or a person of color, is allegedly the plaintiff.

22.     Notwithstanding, defendants could not accuse plaintiff of theft on the sole basis of the surveillance tape.  Due to the poor quality of the captured images, the identity of the plaintiff is questionable because the purported image, the image that identifies the plaintiff as stealing food stuff, is unclear.  Additionally, other than the plaintiff, the captured footage shows a number of other individuals in the cafeteria line at the same time.

23.     Thereafter, Diaz received instruction to obtain a statement from plaintiff for use as a confession to "seal her fate."  On or about the end of June 2005, Diaz sent for plaintiff to come to the security building alone.  At the time, plaintiff was not provided with union representation, any preparation, or forewarning of any kind.  When plaintiff arrived at the security building, she was placed in a room alone with Diaz.  Plaintiff who is but four-foot-eleven, was ordered to sit down.  Diaz, who is physically large, leaned over plaintiff in a menacing, threatening, and intimidating manner.  Defendant threatened plaintiff with her job if she did not fully cooperate with his demands.

24.     Diaz's questioning centered on Velda's practice of allowing nursing personnel to pay at a later time rather than focusing on plaintiff's actions through the cafeteria line.  Plaintiff's statement clearly reflects that plaintiff only answered questions regarding Velda's regular practices of allowing nursing personnel to pay later.  Plaintiff's also states that while she may have forgotten to pay Velda on a few occasions, Velda has consented for plaintiff to pay later.

25. Therefore, plaintiff did attempt to comply conditionally with Diaz. Based upon Diaz's assurance of confidentiality and immunity from adverse employment actions regarding the meeting, plaintiff submitted a statement detailing her mistake at forgetting to repay Velda for food stuffs. Plaintiff's statement also asserted her willingness to repay Velda. Despite plaintiff's compliance, Diaz was not satisfied with plaintiff's statement and proceeded to dictate to plaintiff, his own rendition of what the plaintiff should admit.

26. An examination of the statement, which defendants claim to be plaintiff's, reveals that the statement is obviously not hers; plaintiff lacks the vocabulary for the wording that appears, and the sentences are repetitive and out of context.

27. Moreover, even if Diaz's dictated statement of the plaintiff is taken as true, it still does not rise to the level to constitute petty larceny. Plaintiff's statement, as claimed by defendant, as is, explains nothing more than an instance where Velda allowed plaintiff and others, to pay her at a different time than when they went through the cafeteria line for the food obtained in the 'employees only' cafeteria.

28. Her statement clearly demonstrates that at no time was there any intent to deprive Mount Sinai of money, property, or food. The statement merely suggests that plaintiff, like many others, may have forgotten to repay Velda on some occasion. Velda's practice was viewed an accepted routine and practice, neither the plaintiff nor the other nursing personnel committed an act of theft.

29. Notwithstanding, plaintiff was suspended from her job by Kiminski on June 17, 2005 where the suspension had been previously approved by Cohen and Tiger. Thereafter, plaintiff was terminated on or about July 20, 2005. At no time was plaintiff shown the surveillance tape before she was terminated despite her many and repeated

demands to see it. At the time of plaintiff's termination she has worked at Mount Sinai for over fourteen-years. During that time, she rose from her entry position as housekeeper, to nursing assistant and then later to a certified operating room technician.

## V. AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS DIAZ, COHEN, TIGER, KIMINSKI AND MOUNT SINAI HOSPITAL FOR DEFAMATION

32.     Plaintiff repeats and reiterates paragraphs 1 - 31 above, as if fully set forth in this paragraph. That on or about July 06, 2005, proceedings were held to determine whether the plaintiff had stolen, purloined, or committed a larceny against the hospital, by stealing food from the cafeteria GP-3.

33.     At the proceedings, defendant Tiger presided and concurred with the statements made by Diaz, Kiminski, and others, concerning plaintiff's purported actions shown in the surveillance devices and the statement Diaz claimed plaintiff gave. Diaz rests his claim, the claim that the plaintiff was a thief and had stolen from the hospital, on the images captured from the surveillance devices and on the statement written by the plaintiff under Diaz's instruction.

34.     Although the statement submitted is purportedly the plaintiff's, it cannot, in any manner, be read to demonstrate that plaintiff's actions constitute an intent to deprive Mount Sinai of property or things of value.

35.     However, at the July 06, 2005 proceedings, Diaz failed to produce the surveillance images. Diaz's failure to provide the evidence on which he based his claims caused the proceedings to be adjourned until July 07, 2005.

36. On July 07, again, Diaz failed to produce the video tape to support his allegations that plaintiff was a thief and she had stolen from the cafeteria GP-3. In addition to Diaz's inability to produce the video tape to support his claim, no one else produced additional evidence. Again, the proceedings were adjourned to July 15, 2005, to allow for the viewing of Diaz's surveillance tapes.

37. On July 15, 2005, Diaz again failed to produce the surveillance tapes for viewing. Therefore, plaintiff was unable to see the only evidence that supported Diaz's claim of plaintiff's theft. Despite Defendant's, and each of them, claims that they had seen Diaz's surveillance tapes. which showed plaintiff stealing food from the cafeteria, GP-3, to date, plaintiff has not been shown the surveillance tapes which defendant Diaz claims depict plaintiff stealing from the GP-3 cafeteria.

38. Notwithstanding, plaintiff was discharged from her position, which ended her fourteen-years of employment with Mount Sinai Hospital. Thereafter, termination letters were sent from the hospital by defendants to personnel in Human Resources, the Nursing Department, and the offices of the Union to which plaintiff belonged. The termination letter stated that plaintiff received termination from her employment for violating the hospital's "Zero-Tolerance" policy for theft. Furthermore, on July 15th, 16th, and 17th, defendant Kiminski was heard, by employees who worked in the surgical suite, telling other employees that plaintiff had been terminated from her position for stealing food from the cafeteria.

39. Hospital personnel who worked in the surgical suites in the Annenberg Annex all received information that plaintiff's dismissal resulted from her alleged theft. Only through the indiscretion of Diaz, Kiminisky, Tiger, or Cohen could others have learned about plaintiff's dismissal.

40. The defendants' allegations that the plaintiff was a thief and had stolen food from the cafeteria are utterly false. Such allegations are unsupported by any evidence and have been stated by the defendants, and each of them, with a reckless disregard for the truth; most noticeably evidenced by defendants' continued failure to produce the surveillance images purportedly obtained by Defendant Diaz. The actions undertaken by Diaz constitute both libel per-se and slander per-se.

41. That as a direct proximate cause of defendants', and each of them, actions; plaintiff has suffered a loss of income, both past and future, damage to her reputation and character, and great mental and emotional suffering.

42. As a result, plaintiff was evicted from her apartment for failing to pay rent and eventually forced onto the welfare rolls. Additionally, plaintiff was unable to retain her regular obstetrician to deliver her child due to the loss of her medical benefits. Her former co-workers no longer call her and she has lost standing amongst her friends, co-workers, and her peers.

43. Plaintiff seeks compensatory damages of $1,000,000.00 and punitive damages of $5,000,000.00.

## VI. AS AND FOR SECOND CAUSE OF ACTION

44. Plaintiff repeats and reiterates paragraphs 1- 43 above as if fully set forth in this paragraph.

45. That, besides plaintiff, Diaz's investigation had revealed other individuals who allegedly stole food from cafeteria GP-3. Defendants Diaz, Cohen, and Tiger and on occasion Kiminski, also spoke to the other individuals, but unlike plaintiff, these individuals did not receive a dismissal from their respective positions.

46. That each and everyone of the other individuals, who were either plaintiff's co-workers, or held a position superior to plaintiff, were all Caucasians, or at the very least, not a minority or a person of color such as plaintiff.

47. That plaintiff was terminated because of her race and national origin, and the accusations that plaintiff had stolen food from the cafeteria were pretext for defendants' racial discrimination, all in violation of 42 U.S.C §1981.

48. That as a direct proximate cause of defendants', and each of them, actions; plaintiff has suffered a loss of income, both past and future, damage to her reputation and character, and great mental and emotional suffering.

49. As a result, plaintiff was evicted from her apartment for failing to pay rent and eventually forced onto the welfare rolls. Additionally, plaintiff was unable to retain her regular obstetrician to deliver her child due to the loss of her medical benefits. Her former co-workers no longer call her and she has lost standing amongst her friends, co-workers, and her peers.

50. Plaintiff seeks compensatory damages of $1,000,000.00 and punitive damages of $5,000,000.00.

## VII. AS AND FOR THIRD CAUSE OF ACTION

51. That plaintiff repeats and reiterates each and every allegations contained in paragraphs1- 50 as if fully set forth here.

52. That defendants did agree, consent, and conspire to act with each other and each with the other to accomplish the overt acts specified above, and to terminate plaintiff's employment with Mt. Sinai.

52. That at all times, defendants, and each of them, were aware that their actions would deprive plaintiff of the rights provided to her under the New York State's constitution and laws; and therefore did violate 42 USC §1985 (3).

53. That as a direct proximate cause of defendants', and each of them, actions; plaintiff has suffered a loss of income, both past and future, damage to her reputation and character, and great mental and emotional suffering.

54. As a result, plaintiff was evicted from her apartment for failing to pay rent and eventually forced onto the welfare rolls.  Additionally, plaintiff was unable to retain her regular obstetrician to deliver her child due to the loss of her medical benefits.  Her former co-workers no longer call her and she has lost standing amongst her friends, co-workers, and her peers.

55. Plaintiff seeks compensatory damages of $1,000,000.00 and punitive damages of $5,000,000.00.

**Wherefore**, for all the reasons stated above, plaintiff prays the court grants her judgment, against defendants, and each of the as follows:

Regard to plaintiff's first cause of action: compensatory damages of $1,000,000.00 and punitive damages of $5,000,000.00; with regard to plaintiff's second Cause of action, $1,000,000.00 in compensatory damages and $5,000,000.00 in punitive damages; with regard to plaintiff's third cause of action.

Date: June 28, 2006                              Respectfully Submitted

                                                                                                   _____
James B. LeBow, Esq.
Attorney for Plaintiff
Sabrina Rambarran